**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOURDES MATSUMOTO; NORTHWEST ABORTION ACCESS FUND; INDIGENOUS IDAHO ALLIANCE, | No. 23-3787 |
| | D.C. No. 1:23-cv-00323-DKG |
| *Plaintiffs - Appellees*, | |
| v. | OPINION |
| RAUL LABRADOR, in his capacity as the Attorney General for the State of Idaho, | |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Idaho
Debora K. Grasham, Magistrate Judge, Presiding

Argued and Submitted May 7, 2024
Seattle, Washington

Filed December 2, 2024

Before: M. Margaret McKeown, Carlos T. Bea, and John
B. Owens, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Bea

## SUMMARY[*]

### First Amendment/Abortion

The panel affirmed in part and reversed in part the district court's order preliminarily enjoining Idaho's abortion trafficking statute, Idaho Code § 18-623, and remanded for further proceedings.

Section 18-623 defines the crime of "abortion trafficking" as procuring an abortion or obtaining an abortion-inducing drug for an unemancipated minor by "recruiting, harboring, or transporting" a pregnant minor with the intent to conceal the abortion from the minor's parents or guardian.

The panel held that Idaho attorney Lourdes Matsumoto and two advocacy organizations (collectively "Challengers"), who seek to counsel pregnant minors in Idaho and provide material support to access legal abortions in other states, had standing to bring a pre-enforcement challenge to the statute because they reasonably asserted that the course of conduct they wished to engage in would put them at credible risk of prosecution under Section 18-623.

The panel held that the Idaho attorney general is a proper defendant under the *Ex parte Young*, 209 U.S. 123 (1909)

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

exception to Eleventh Amendment sovereign immunity because the attorney general's authority to prosecute abortion trafficking derives from a specific grant of authority in Section 18-623, not a general provision of authority to enforce state laws. Section 18-623 grants the Idaho attorney general the authority, at the attorney general's sole discretion, to prosecute a person for a criminal violation of this section if the prosecuting attorney authorized to prosecute criminal violations of this section refuses to do so.

Turning to the merits of the district court's grant of the injunction, the panel held that Challengers are unlikely to succeed on the merits of their claim that Section 18-623 is void for vagueness and facially burdens their rights to expressive association. Challengers are also unlikely to prevail on the merits of their facial First Amendment claim that the statute's prohibition on "harboring" and "transporting" infringes on their First Amendment speech rights because the conduct covered by "harboring" and "transporting" is not expressive on its face.

The panel held that Challengers are likely to succeed on the merits of their facial First Amendment claim that the Section 18-623's "recruiting" prong unconstitutionally infringed on their protected speech. The provision is unconstitutionally overbroad because it prohibits a substantial amount of protected expressive speech relative to its plainly legitimate sweep. However, the "recruiting" prong can be severed from the rest of the statutory provisions because it is neither integral nor indispensable to the operation of the statute as the Idaho legislature intended.

Accordingly, the panel affirmed the district court's order preliminarily enjoining the Idaho attorney general from enforcing the "recruiting" prong of Section 18-623. Because

Challengers are unlikely to succeed on the merits of their remaining claims, the panel reversed the district court with respect to those claims and remanded to the district court to modify the preliminary injunction.

Concurring in the judgment in part and dissenting in part, Judge Bea wrote that plaintiffs have not established Article III standing because plaintiffs sued only the Idaho Attorney General, who does not and cannot enforce Section 18-623—only 44 county prosecutors can. The Idaho Attorney General can enforce the statute only if one or more of the county prosecutors refuses to do so, but none has. Plaintiffs' injuries are not traceable to the attorney general, and, for the same reasons, the injunction issued by the district court does not redress their alleged injuries. Judge Bea would reverse the district court in full and remand with instructions to dismiss the case for lack of subject matter jurisdiction.

## COUNSEL

Wendy J. Olson (argued), Stoel Rives LLP, Boise, Idaho; Kelly O'Neill, Legal Voice, Boise, Idaho; Wendy S. Heipt, Legal Voice, Seattle, Washington; Jamila A. Johnson, The Lawyering Project, New Orleans, Louisiana; Paige Suelzle, The Lawyering Project, Burien, Washington; for Plaintiffs-Appellees.

Joshua N. Turner (argued), Acting Solicitor General; Michael A. Zarian, Deputy Solicitor General; Alan M. Hurst, Solicitor General; Aaron M. Green, Deputy Attorney General; James E.M. Craig, Chief, Civil Litigation and Constitutional Defense; Raul R. Labrador, Idaho Attorney

General; Idaho Office of the Attorney General, Boise, Idaho; for Defendant-Appellant.

Jonah Horwitz, Assistant Federal Public Defender, Federal Defenders of Idaho, Capital Habeas Unit, Boise, Idaho; Sarah Tompkins, Boise, Idaho; for Amici Curiae the Idaho Association of Criminal Defense Attorneys.

Colleen R. Smith, Stris & Maher LLP, Washington, D.C.; Chelsea Gonzales, Advocates for Youth, Washington, D.C.; Alanna Peterson, National Network of Abortion Funds, Beaverton, Oregon; Alexander M. Wolf and Drew M. Padley, Steptoe LLP, Houston, Texas; Jessica S. Goldberg, If/ When/ How: Lawyering for Reproductive Justice, Oakland, California; for Amici Curiae Advocates for Youth, If/ When/ How: Lawyering for Reproductive Justice, and National Network of Abortion Funds.

Sarah E. Smith-Levy, Assistant Attorney General; Emma Grunberg and Cristina Sepe, Deputy Solicitors General; Robert W. Ferguson, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; Kris Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Rob Bonta, California Attorney General, Office of the California Attorney General, Oakland, California; Philip J. Weiser, Colorado Attorney General. Office of the Colorado Attorney General, Colorado Department of Law, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawaii Attorney General, Office of the Hawaii Attorney General, Honolulu, Hawaii; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney

General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea Joy Campbell, Commonwealth of Massachusetts Attorney General, Office of the Commonwealth of Massachusetts Attorney General, Boston, Massachusetts; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Raul Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; for Amici Curiae States of Washington, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Vermont.

Shahily Negron, The Law Firm of Shahily Negron, Reading, Pennsylvania; Jonathan Wallace, Amagansett, New York; for Amici Curiae Gina Whitney, Shahily Negron, Jonathan Wallace, and The Parachute Project.

**OPINION**

McKEOWN, Circuit Judge:

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court "return[ed]" the authority to regulate or prohibit abortion to the "people and their elected representatives." 597 U.S. 215, 232 (2022). Idaho has heeded this invitation with gusto. With the laboratory of democracy in high gear, litigation has followed. Case after case challenging nearly every aspect of Idaho's post-*Dobbs* regime has made its way up to this court—and beyond.[1]

This case concerns a unique legislative undertaking: an "abortion trafficking" statute. Idaho Code § 18-623. Idaho defines the crime of "abortion trafficking" as "procur[ing] an abortion" or "obtain[ing] an abortion-inducing drug" for an unemancipated minor by "recruiting, harboring, or transporting [a] pregnant minor" with the intent to conceal the abortion from the minor's parents or guardian. This provision appears to be the first post-*Dobbs* statute to criminalize the act of helping another person obtain an

---

[1] *United States v. Idaho*, No. 23-35440 (9th Cir.), *cert. granted sub nom. Idaho v. United States*, 144 S. Ct. 541 (mem.), *dismissing as improvidently granted*, 144 S. Ct. 2015 (2024); *United States v. Moyle*, No. 23-35450 (9th Cir.), *cert. granted sub nom. Moyle v. United States*, 144 S. Ct. 540 (mem.), *dismissing as improvidently granted*, 144 S. Ct. 2015 (2024); *Planned Parenthood Great Nw., Haw., Alaska, Ind., Ky. v. Labrador*, No. 23-35518 (9th Cir. argued Mar. 27, 2024).

MATSUMOTO V. LABRADOR

abortion, even if that abortion is legal in the state where it occurs.[2]

Idaho attorney Lourdes Matsumoto and two advocacy organizations, Northwest Abortion Access Fund and the Indigenous Idaho Alliance (collectively "Challengers"), seek to counsel pregnant minors in Idaho and provide material support to access legal abortion in other states. They moved to enjoin Section 18-623, arguing that the abortion trafficking statute violates the First Amendment and is void for vagueness. The district court granted the injunction on both grounds. As a threshold matter, we conclude that Challengers have standing and that the Idaho attorney general is a proper defendant under *Ex parte Young*, 209 U.S. 123 (1909). We affirm the injunction in part because the statute's provision on "recruiting" violates the First Amendment by prohibiting "a substantial amount of protected speech relative to its plainly legitimate sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (internal marks and citation omitted). However, we reverse the district court insofar as the "recruiting" provision is severable from the other statutory provisions, including the prohibition of "harboring and transporting," which do not violate Challengers' First Amendment rights. We also conclude that the statute is neither void for vagueness nor facially in violation of the First Amendment rights of association. Thus,

---

[2] James Dawson, *Idaho Lawmakers Pass a Bill to Prevent Minors from Leaving the State for Abortion*, NPR (Mar. 30, 2023), https://www.npr.org/2023/03/30/1167195255/idaho-trafficking-abortion-minors-interstate-travel-criminalize; Alanna Vagianos, *Idaho is About to be the First State to Restrict Interstate Travel for Abortion Post-Roe*, *Huffington Post* (Mar. 28, 2023), https://www.huffpost.com/entry/idaho-abortion-bill-trafficking-travel_n_641b62c3e4b00c3e6077c80b.

we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.**[3]**

## Background

Idaho Code Section 18-623 was introduced in February 2023 as House Bill 242. *See* H.B. 242, 67th Leg., 1st Sess. (Idaho 2023). In a hearing on the proposed legislation before the House State Affairs Committee, the legislation's sponsor ceded his time to a lobbyist from Right to Life of Idaho, who described the legislation as a "parents' rights bill," written to combat the following scenarios: (1) an underage victim of sex trafficking is transported by her trafficker over the border to receive an abortion; (2) a minor is compelled by her adult male partner to procure an abortion and keep it secret from her parents to conceal the evidence of another crime (*e.g.*, statutory rape); and (3) a minor is taken out of state to get an abortion via the family of another minor with whom she has a romantic relationship. **[4]** The lobbyist asserted that the legality of abortion in neighboring jurisdictions made Section 18-623 necessary, because "nothing could legally be done about the actions of the boyfriend's family or another unrelated adult if they had not violated any law." *See* House Committee Debate at 1:02:45. The bill passed both houses of the legislature on March 30,

---

[3] In connection with these proceedings, we received amicus curiae briefs from an array of interested parties, including state governments, nonprofit groups, and professional associations. The briefs were helpful to our understanding of the implications of this case from a range of diverse viewpoints. We thank amici for their participation.

[4] *See* Debate of House Affairs Comm., 67th Leg., 1st Sess., at 59:15 (Idaho Mar. 3, 2023), https://insession.idaho.gov/IIS/2023/House/ Committee/State%20Affairs/230303_hsta_0830AM-Meeting.mp4 [hereinafter "House Committee Debate"].

was signed by the governor a week later, and went into effect on May 5, 2024.

Idaho Code Section 18-623 criminalizes "abortion trafficking," defined as "[a]n adult who, with the intent to conceal an abortion from the parents or guardian of a pregnant, unemancipated minor, either procures an abortion, . . . or obtains an abortion-inducing drug . . . by recruiting, harboring, or transporting the pregnant minor within" the state of Idaho. Idaho Code § 18-623(1). By way of exemption, the statute provides that "the terms 'procure' and 'obtain,'" as they are used in the definition of "abortion trafficking," "shall not include the providing of information regarding a health benefit plan." *Id.* [5] The statute also provides for an affirmative defense if "a parent or guardian of the pregnant minor consented to trafficking of the minor," *id.* § 18-623(2), but clarifies that "[i]t shall not be an affirmative defense to a prosecution . . . that the abortion provider . . . is located in another state," *id.* § 18-623(3). The statute grants the Idaho attorney general "the authority, at the attorney general's sole discretion, to prosecute a person for a criminal violation of this section if the prosecuting attorney authorized to prosecute criminal violations of this section refuses to prosecute violations of any of the provisions of this section by any person without regard to the facts or circumstances." *Id.* § 18-623(4). The crime of "abortion

---

[5] This limitation was added to the bill after Regence Health, a local health insurance provider, voiced concerns that its employees might be inadvertently covered by the bill if asked by a minor whether their insurance plan covers abortions. *See* Debate of Senate Affairs Comm., 67th Leg., 1st Sess., at 5:26 (Idaho Mar. 27, 2023), https://insession.idaho.gov/IIS/2023/Senate/Committee/State%20Affair s/230327_ssta_0800AM-Meeting.mp4 [hereinafter "Senate Committee Debate"].

trafficking" is punishable by a prison term of no less than two years and no more than five years. *Id.* § 18-623(5).

On July 11, 2023, Challengers brought this action against Idaho Attorney General Raúl Labrador ("Idaho"). They assert that they have provided guidance and material support to minors inside and outside of Idaho to access legal abortion care in the past and want to continue to do so. They contend that Idaho Code Section 18-623 is void for vagueness under the Fourteenth Amendment, infringes on their First Amendment rights to speak and associate, and infringes on their rights to inter- and intrastate travel.

In the district court, Challengers sought to enjoin the law based only upon void-for-vagueness and First Amendment claims. Idaho responded by moving to dismiss, arguing that the attorney general is an improper defendant under *Ex parte Young*; that Challengers lack standing; and that each of the claims fails as a matter of law. The district court granted the preliminary injunction, concluding that the attorney general was a proper defendant under *Ex parte Young* and that Challengers had sufficiently demonstrated both standing to sue and a likelihood of success on the merits of their First Amendment and void-for-vagueness claims. The court also granted in part and denied in part Idaho's motion to dismiss, dismissing only the claim that Section 18-623 violated the right to intrastate travel, allowing all other claims to continue. Idaho promptly appealed both rulings.[6]

---

[6] We have jurisdiction over the district court's grant of the preliminary injunction. We have jurisdiction over only a portion of the district court's order on Idaho's motion to dismiss. While we may review a denial of a motion to dismiss on sovereign immunity grounds, *see, e.g.*, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147

## Analysis

We first address de novo two threshold issues: whether Challengers have standing to sue to enjoin Section 18-623; and whether the Idaho attorney general is a proper defendant under the *Ex parte Young* exception to sovereign immunity. *See, e.g.*, *Save Bull Trout v. Williams*, 51 F.4th 1101, 1105–06 (9th Cir. 2022) (standing); *Walden v. Nevada*, 945 F.3d 1088, 1092 (9th Cir. 2019) (sovereign immunity).

### I. Standing

To establish "the irreducible constitutional minimum of standing," Challengers must demonstrate: (1) that they have suffered an injury-in-fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A. Injury-in-Fact

In a pre-enforcement challenge, a litigant "satisfies the injury-in-fact requirement [by alleging] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Importantly, a challenger need not "confess that he will in fact violate that law." *Id.* at 163. Rather, such a plaintiff need only express "the intention to engage in the

---

(1993), we "elect not to exercise pendent appellate jurisdiction" to review the district court's denial of the motion to dismiss as to the interstate travel claim or its grant of the motion to dismiss as to the intrastate travel claim, *see, e.g.*, *Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1093 (9th Cir. 2007).

proscribed conduct, were it not proscribed." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024).

In asserting their First Amendment rights, Challengers claim that, in arguable violation of the statute, they have provided guidance and material support to minors in Idaho to access legal abortion care and intend to do so in the future. Their declarations stated that they "have been willing to help pregnant minors obtain reproductive options counseling and healthcare, including abortion, without the consent of the minors' parents," and noted that "[t]he parents and guardians of the minors to whom we provide information about abortion may or may not be aware of, or consent to, the provision of information regarding abortions." Idaho has never signaled that such conduct does not violate the statute, and in the district court, it asserted that such a "pattern" of "purposely not informing the parents" could contribute to a finding of intentional concealment under Section 18-623. In view of these allegations, Challengers are "presently or prospectively subject" to Section 18-623. *Laird v. Tatum*, 408 U.S. 1, 11 (1972).

This statute is of recent vintage—less than six months old. In challenging a new law whose history of enforcement is negligible or nonexistent, either a "general warning of enforcement" or a "failure to *disavow* enforcement" is sufficient to establish a credible threat of prosecution in pre-enforcement challenges on First Amendment grounds. *Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) (emphasis in original); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) ("The Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do."); *Isaacson v. Mayes*, 84 F.4th 1089, 1100–01 (9th Cir. 2023) (finding a credible

threat of enforcement even where the Arizona attorney general expressly disavowed enforcement).

As the district court found, "Idaho Code Section 18-623 causes Plaintiffs to self-censor their speech and expressive activities due to fear of prosecution . . . ." While Idaho downplays the extent of the attorney general's enforcement authority under Section 18-623, it has never disavowed his authority. In fact, the attorney general affirmed that the statute "authorizes the Attorney General to prosecute violations of Idaho Code [S]ections 18-622 or 18-623 if the local prosecuting attorney refuses to." Att'y Gen. Op. No. 23-1 at 2–3. That opinion, issued just before enactment of the statute, explicitly reinforced the attorney general's prosecutorial authority and took the position that the statute was constitutional.

Nor has Idaho attempted to "prevent county attorneys from enforcing the statute." *Isaacson*, 84 F.4th at 1100. Quite the opposite—Idaho is vigorously defending the constitutionality of the statute and its broad coverage. Under these facts, Challengers have established a credible threat of prosecution under Section 18-623.

Challengers have asserted a particularized injury that is the result of the "statute's actual or threatened enforcement." *California v. Texas*, 593 U.S. 659, 670 (2021). For the above reasons, the threat of future enforcement of the statute against Challengers is indeed "credible." *Babbitt*, 442 U.S. at 298. This predicate is all that is needed to show imminent injury to a constitutional interest in a pre-enforcement challenge. *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (limiting additional requirements to cases where there is no challenge to a criminal statute's constitutionality).

Challengers' standing is not short-circuited by the fact that there are multiple authorized enforcers of the statute. The dissent's suggestion that Challengers must establish a substantial likelihood of enforcement *specifically* by the one named authority is foreclosed by *Susan B. Anthony List*. There, the Court analyzed the credibility of the threat of enforcement against the plaintiffs under an Ohio state law *not* by looking *only* to the threat posed by defendant Driehaus—an individual complainant to the Ohio Elections Commission—but rather to the threat posed *collectively* by the entire "universe of potential complainants." 573 U.S. at 164. The analysis found that each actor with "authority to file a complaint with the Commission"—including the many actors who were not named as defendants—added to or "bolstered" the overall threat. *Id. Susan B. Anthony List* thus stands for the proposition that, when a statute distributes enforcement authority across multiple actors, and a plaintiff brings a pre-enforcement challenge, the threat of that enforcement is properly analyzed as a collective assessment of the threat posed by *all* the potentially enforcing authorities, together. [7] Notably, despite the dissent's

---

[7] Although *Susan B. Anthony List* involved a different context, there are prudential reasons to apply the Court's logic here. Our courts treat prosecutors' discretionary enforcement decisions as unreviewable largely because they involve "a complicated balancing of a number of factors which are peculiarly within [the enforcer's] expertise," *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), including the resources of the enforcer's office. To hold at the pre-enforcement stage that the likelihood of enforcement must be assessed individually would be to invite, in any facial challenge, judicial scrutiny of every defendant prosecutor's enforcement record, office policies, budgetary constraints, and a multitude of other considerations. Our standing jurisprudence does not impose this burden.

suggestion otherwise, we cite this case with respect to injury and not traceability or redressability.

### B. Traceability and Redressability

The next inquiry in the standing sequence is whether Challengers' injuries are fairly traceable to the challenged Idaho code and whether those injuries are likely to be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560.

To establish traceability, *Lujan* has long required that "there must be a causal connection between the injury and the conduct complained of." *Id.* "An injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (internal marks and citation omitted). The injury here is the burden on Challengers' First Amendment rights—and, importantly, includes the chilling of those rights under the *threat* of prosecution.

Through the legislature's chosen vessels, the statute poses a threat to Challengers' First Amendment rights. Challengers have sued one of the vessels through which the statute's effects—by its own terms—flow. This link suffices to meet their burden of showing causation and traceability. The statute supplies all the trace needed.

We are supported in this conclusion by our sister circuits. *See Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 784–85 (5th Cir. 2024), *cert. denied sub nom. Nat'l Press Photographers v. Higgins*, No. 23-1105 (U.S. Oct. 7, 2024) (finding that traceability was satisfied as to three individual defendants where, as the attorney general does here, each possessed "authority to enforce" the laws at issue.

One defendant was the head of an agency statutorily authorized to "enforce the laws protecting the public safety"; another had "statewide law-enforcement and arrest authority"; and the third was "charged with prosecuting individuals who violate criminal laws."); *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007) ("[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision.")[8]; *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1175 (10th Cir. 2021), *rev'd on other grounds*, 600 U.S. 570 (2023) (concluding in favor of traceability even where government defendant had "limited" enforcement authority).

Typically, when a court undertakes a "chain of causation" traceability analysis, it does so because the case involves unregulated plaintiffs and the actions of private third parties. This case, involving regulated plaintiffs and the actions of statutorily authorized enforcers, is distinct from that class of cases. Even assuming that a "chain of causation" analysis applies here, "the causation chain does not fail solely because there are several links or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023) (internal marks and citation

---

[8] The dissent's characterization of *Bronson* does not tell the full story. There, the Tenth Circuit concluded that the plaintiffs lacked standing because "[p]laintiffs' theory of causation is based upon the alleged benefits that would flow to them as a consequence of [the defendant's] issuance of a marriage license—not an alleged injury that [the defendant's] actions have inflicted or, in imminent fashion, will inflict upon them." *Bronson*, 500 F.3d at 1111. In contrast to the circumstances here, in *Bronson* there was "no nexus between this defendant's past or possible future conduct and plaintiffs' fear of criminal prosecution." *Id.* at 1110.

18          MATSUMOTO V. LABRADOR

omitted). We recognize that the Supreme Court has warned that "a highly attenuated chain of possibilities" will not establish the requisite causation for standing purposes. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

The chain of enforcement by the Idaho attorney general has, at most, three links: First, Challengers engage in conduct arguably proscribed by the statute; second, an Idaho county prosecutor refuses to prosecute the violation; and third, the Idaho attorney general decides, at his "sole discretion," to prosecute Challengers himself. Idaho Code § 18-623(4). We consider the attorney general's authority in more detail in the following section. Suffice it to say that this chain of causation is hardly "hypothetical," "tenuous," or "[im]plausible," considering that the legislature wrote this precise causation chain into Section 18-623.

In sum, the statute was proposed with the express purpose of enabling prosecution by the attorney general; a fiscal analysis was done, predicting that the attorney general's office would have sufficient funds to undertake prosecutions; and most importantly, the statutory text grants the attorney general "sole discretion" to exercise prosecution authority that he has still not disavowed.[9] The point of the

---

[9] The Court's most recent decision touching upon these issues, *Murthy v. Missouri*, is not in tension with this conclusion. 603 U.S. 43 (2024). In *Murthy*, the standing theory relied on a wobbly chain of causation with two tenuous assumptions: First, that social media platforms would continue restricting their posts or accounts based on their statements about the COVID-19 pandemic; and second, that government agencies would continue "pressuring or encouraging the platforms to suppress" their speech on that topic. *Id.* at 57. The Court held that "plaintiffs must show that the third-party platforms 'will likely react in predictable ways' to the [government's] conduct," and could not do so. *Id.* at 57–58

case-and-controversy requirement is to ensure that adverse legal interests of the parties on both sides are at issue. Here, the statutory text clearly grants the attorney general a legal right to prosecute that, in the dissent's own telling, he would not otherwise have.

Nor is it the case that Challengers cannot establish traceability because the conduct they wish to engage in could, theoretically, violate other unchallenged Idaho statutes. As a matter of statutory interpretation, there is a fair amount of conduct that Challengers seek to engage in that only Section 18-623 proscribes, such as counseling or advising minors on how to obtain a legal abortion in other states. This conduct is not proscribed by Idaho's "[e]nticing of children" statute, Idaho Code § 18-1509(1); its "child custody interference" statute, Idaho Code § 18-4506; or its ban on "[p]roviding shelter to runaway children," Idaho Code § 18-1510(1). Not to mention that two of these statutes impose an age limit younger than the age of majority set out under Section 18-623—eighteen. *See* Idaho Code § 18-604(10) (defining "Minor" as "a woman under eighteen (18) years of age" for statutes in the chapter on "Abortion and Contraceptives"). In this respect, Idaho's abortion trafficking statute arguably criminalizes a wider range of

---

(quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019)). Whereas in *Murthy* the plaintiffs crafted a chain of causation out of whole cloth, here the chain of causation is laid out in the statute itself. It hardly "require[s] guesswork" to connect the statute, through the attorney general's prosecutorial authority, to Challengers' proposed actions—as his authority is explicitly spelled out in Section 18-623(4). *Id.* at 57 (quoting *Clapper*, 568 U.S. at 413).

Challengers' anticipated expression and conduct than the child protection laws that existed prior to its passage.[10]

At bottom, Challengers reasonably assert that the course of conduct they wish to engage in would put them at risk of prosecution under Section 18-623. Idaho, for its part, does not disabuse them of that notion. Instead, Idaho argues only that Challengers do not plead the requisite mens rea—not that their conduct would not violate Section 18-623. Challengers' injuries are thus fairly traceable to the attorney general's enforcement power under Section 18-623, even if Idaho could theoretically prosecute them under other statutes for some (but not all) of their proposed conduct. *Tucson v. City of Seattle*, 91 F.4th 1318, 1326 (9th Cir. 2024) ("Plaintiffs are not required to challenge all laws that plausibly criminalize their desired course of conduct in a given jurisdiction, regardless of how credible the threat to enforce those laws is.").

Challengers are not required to "demonstrate that there is a 'guarantee' that their injuries will be redressed by a favorable decision." *Mecinas v. Hobbs*, 30 F.4th 890, 900 (9th Cir. 2022) (quoting *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012)). Instead, "[r]edressability is satisfied

---

[10] For her part, the lobbyist advocating for the bill seemed to agree. In her statement to the House State Affairs Committee, she seemed to believe that existing Idaho child-protection statutes could not be effectively marshaled to combat "abortion trafficking." *See* House Committee Debate at 1:02:45 ("Perhaps nothing could legally be done about the actions of a boyfriend's family or another unrelated adult if they had not violated any law. But if HB 242 is made law here in Idaho there will be a criminal offense under which to prosecute . . . ."). And this conclusion makes intuitive sense. After all, why would a legislature pass a law prohibiting only conduct that is already prohibited under existing law?

so long as the requested remedy 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *Id.* (quoting *Renee*, 686 F.3d at 1013).

Partial amelioration of a harm also suffices for redressability. In discussing injury, the Supreme Court highlighted that a plaintiff need only show redress of "an injury," not "every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (emphasis omitted).

Idaho offers a variation on its standing argument that redressability fails because county prosecutors would retain authority to bring prosecutions even if the attorney general were enjoined from enforcement of Section 18-623. Where a state statute specifically grants enforcement powers to multiple government authorities, an injunction against the exercise of those powers by any one of those authorities suffices to establish redressability. That proposition is supported by decades of Supreme Court precedent. Citing approvingly to the very footnote that the dissent disputes, the Supreme Court has concluded that, if a court decision can provide a "small incremental step" to reduce the risk of harm to the plaintiffs "to some extent," that is enough to show causation as well as redressability. *Massachusetts v. EPA*, 549 U.S. 497, 524–26 (2007). None of the cases cited by the dissent contradicts this logic. This is unsurprising, for our courts adhere to the simple principle that, absent an express statutory provision to the contrary, a plaintiff need not sue every defendant that may cause her harm. *See Jones v. Bock*, 549 U.S. 199, 217 (2007).

Facing the threat of prosecution by an enforcer with statutory authority to bring suit, Challengers have satisfied

both the traceability and redressability prongs of the standing requirement.

## II. Sovereign Immunity and *Ex parte Young*

The Eleventh Amendment precludes federal courts from hearing "suits brought by a state citizen against the state or its instrumentality in the absence of consent." *Mecinas*, 30 F.4th at 903 (quoting *Culinary Workers Union, Loc. 226 v. Del Papa*, 200 F.3d 614, 619 (9th Cir. 1999)). Despite this prohibition, there is an exception under *Ex parte Young* that allows "actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law," *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012), provided that the officer has "some connection with the enforcement of the act," *Ex parte Young*, 209 U.S. 123, 157 (1908). Therefore, the question we consider is whether the Idaho attorney general's role in enforcing Section 18-623 meets this "some connection" requirement. The answer is yes. Our analysis is squarely grounded in *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004).

As explained with respect to standing issues, it bears repeating here that, under Section 18-623(4), "[t]he Idaho attorney general has the authority, at the attorney general's sole discretion, to prosecute a person for a criminal violation of this section if the prosecuting attorney authorized to prosecute criminal violations of this section refuses to prosecute violations of any of the provisions of this section by any person without regard to the facts or circumstances." This statutorily defined enforcement role satisfies the plain meaning of *Ex parte Young*'s "some connection" standard, which requires only that the official subject to suit has a

"relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Mecinas*, 30 F.4th at 903–04 (quoting *Wasden*, 376 F.3d at 919)). Here, because the attorney general's authority to prosecute "abortion trafficking" derives from a specific grant of authority in Section 18-623, not a general provision of authority to enforce state laws, he is a proper defendant in this action to enjoin his enforcement of that law.[11]

The fact that Section 18-623 does not grant the attorney general exclusive or unconditional enforcement authority does not alter our conclusion. *Wasden* teaches that a defendant's enforcement role need not be exclusive to make that defendant proper under *Ex parte Young*. In *Wasden*, we addressed a different Idaho statute, which provided that "unless the county prosecutor objects, '[t]he attorney general may, in his assistance, do every act that the county attorney can perform.'" 376 F.3d at 920 (alteration omitted) (quoting *Newman v. Lance*, 922 P.2d 395, 399 (Idaho 1996)). There,

---

[11] Compare the specific statutory grant of authority to the attorney general in Idaho Code Section 18-623 with the attorney general's residual authority under the state's near-total abortion ban, Idaho Code Section 18-622. Under Attorney General Labrador's own published general opinion, "the Idaho Attorney General's criminal prosecutorial authority exists only where specifically conferred by statute or upon referral or request by county prosecutors." Att'y Gen. Op. No. 23-1 at 1. Because the abortion ban does not mention the attorney general, it does not grant the attorney general "any authority to prosecute violations" under that section. *Id.* By contrast, Attorney General Labrador has said that Idaho's "abortion trafficking" statute "would give the [a]ttorney [g]eneral discretion to prosecute violations of Idaho Code [Section] 18-623, but only 'if the prosecuting attorney . . . refuses to prosecute violations.'" *Id.* at 2–3.

we noted that both the attorney general and the county prosecutor were proper defendants, because under that statute, "the attorney general may in effect deputize himself (or be deputized by the governor) to stand in the role of a county prosecutor." *Id.*

Crucially, *Ex parte Young* does not require that exercise of the defendant's enforcement role be imminent. *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 846–47 (9th Cir. 2002) (rejecting the argument that *Ex parte Young* requires a "present threat of enforcement"). Nor is proof required that the defendant intends to fulfill an affirmative duty of enforcement. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943–44 (9th Cir. 2013) (denying Eleventh Amendment immunity to an attorney general arguing that she "ha[d] not shown she intend[ed] to enforce" the statute at issue). These are questions more properly considered when examining Article III standing requirements.

Attorney General Labrador's criminal enforcement role under Section 18-623 also clears the low bar set by our sister circuits' interpretations of *Ex parte Young*. *See, e.g.*, *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) ("All that is required is a mere scintilla of enforcement by the relevant state official with respect to the challenged law." (internal quotation marks omitted)); *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1040–41 (6th Cir. 2022) ("direct criminal enforcement authority" is not necessary for *Ex parte Young* to apply) (quoting *Doe v. DeWine*, 910 F.3d 842, 848 (6th Cir. 2018)); *Frank v. Lee*, 84 F.4th 1119, 1132–33 (10th Cir. 2023), *cert. denied*, 144 S. Ct. 1349 (2024) (requiring only some "statutory duties" connected to enforcement); *City of S. Miami v. Governor*, 65 F.4th 631, 644 (11th Cir. 2023) (finding that "sufficient

contact with the state officers that implemented the law" could satisfy).

In sum, "[t]he 'connection' required under *Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'" *Mecinas*, 30 F.4th at 903–04 (quoting *Wasden*, 376 F.3d at 919). "[T]hat connection does not need to be primary authority to enforce the challenged law[,] . . . [n]or does the attorney general need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632–33 (8th Cir. 2011) (citation omitted). The Idaho attorney general's designated role to enforce Section 18-623 "far exceed[s]" this "modest requirement." *Mecinas*, 30 F.4th at 904.

Because Challengers have established standing, and the attorney general is a proper defendant under *Ex parte Young*, we move to the merits of the district court's grant of the injunction.

## III.    The Injunction—Likelihood of Success on the Merits

The district court issued an injunction against enforcement of Section 18-623 on the grounds that the statute is void for vagueness and violates Challengers' First Amendment rights to speech and association. While Challengers are unlikely to succeed on their claim that Section 18-623 is void for vagueness or that it infringes the right of association, we conclude that Challengers are likely to succeed in part on their claim that Section 18-623 impermissibly restricts their First Amendment speech rights.

Although we consider the merits of the district court's grant of the preliminary injunction under an abuse of discretion standard, we review de novo issues of law underlying the preliminary injunction. *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021). Challengers must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm; (3) the balance of equities tips in their favor, and (4) a preliminary injunction is in the public interest. *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We have long recognized that likelihood of success on the merits is the most important factor—and even more so when a constitutional injury is alleged. *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023) ("The first factor—likelihood of success on the merits—is the most important (and usually decisive) one in cases where a plaintiff brings a constitutional claim."). Thus, that is the focus of our analysis.

Before launching into an analysis of the statutory text, we note that this statute is unusual among trafficking statutes, despite its "abortion trafficking" title. There are two fundamental dissimilarities between Section 18-623 and traditional trafficking statutes. To begin, traditional human trafficking statutes typically apply to coercive conduct and/or the facilitation of universally illegal purposes.[12] In

---

[12] *See, e.g.*, Idaho Code § 18-8602(1)(a)(ii) (2023) ("Human trafficking" means: . . . The recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion, for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."); Ala. Code § 13A-6-152(a) ("A person commits the crime of human trafficking in the first degree if: . . .

contrast, Section 18-623 criminalizes non-coercive as well as coercive conduct for the procurement of legal abortions—for instance, performed in Oregon or Washington—as well as illegal ones. *See* Or. Stat. § 109.640(3); Wash. Rev. Code § 9.02.110. The term "trafficking," whether of humans or otherwise, is also usually defined with respect to an illegal trade with economic motive.[13] In contrast, Section 18-623 does not contemplate any type of trade or economic motive.

He or she knowingly obtains, recruits, entices, solicits, induces, threatens, isolates, harbors, holds, restrains, transports, provides, or maintains any minor for the purpose of causing a minor to engage in sexual servitude."); Colo. Rev. Stat. § 18-3-504(1)(a) ("A person commits human trafficking for sexual servitude if the person knowingly sells, recruits, harbors, transports, transfers, isolates, entices, provides, receives, or obtains by any means another person for the purpose of coercing the person to engage in commercial sexual activity.").

[13] *See Trafficking*, Black's Law Dictionary (12th ed. 2024) (defining "human trafficking" as "The illegal recruitment, transportation, transfer, harboring, or receipt of a person, esp. one from another country, with the intent to hold the person captive or exploit the person for labor, services, or body parts" and offenses include "forced prostitution, forced marriages, sweat-shop labor, slavery, and harvesting organs from unwilling donors"); *Trafficking*, Oxford English Dictionary, https://www.oed.com/dictionary/trafficking_n?tab=meaning_and_use ("[I]llegal or illicit trade or dealing, *esp*. the distribution and sale of illegal drugs, or the trade in or procurement of human beings, typically for the purpose of exploitation."); *Trafficking*, Merriam-Webster Dictionary, https://www.merriam-webster.com/legal/trafficking ("[T]he act of buying or selling usually illegal goods."); *Trafficking*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/trafficking ("[T]he act of buying or selling people, or of making money from work they are forced to do, such as sex work."); *see also* Senate Committee Debate at 2:45 (statement by Representative Ehardt, sponsor of the bill that became Section 18-623, describing sex traffickers as "those who actually *traffic* traffic").

The statute's status as an anti-trafficking statute is further called into question by its placement in the Idaho Code.**[14]** Calling the statute "abortion trafficking" does not make it so.

## A. Void-for-Vagueness Challenge

A statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder*, 561 U.S. at 18 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). We "consider whether a statute is vague as applied to the particular facts at issue," because "a plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 18–19 (internal marks and citation omitted). Of significance here, "a more stringent vagueness test should apply" if a statute interferes with First Amendment rights, *id.* at 19, and if a statute imposes criminal sanctions, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1019 (9th Cir. 2013). Even so, the Supreme Court teaches that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

---

[14] Section 18-623 is categorized in Chapter 6 of Title 18 of the Idaho Code, the "Abortion and Contraceptives" section, *see* Idaho Code § 18-601 *et seq.*, rather than the "Commercial Sexual Activity" section, *see id.* § 18-5601 *et seq.*, or the "Human Trafficking" section, *see id.* § 18-8601, where other "trafficking" offenses appear in the Idaho Code. Instead, Section 18-623's neighbors are, for example, Idaho's ban on "advertising medicines or other means for preventing conception," *see id.* § 18-603, and Idaho's near-total abortion ban, *see id.* § 18-622.

Challengers argue that the statute is unconstitutionally vague. They claim that they are unsure as to the scope of the statute and thus "intend to refrain from their usual activities for fear of prosecution."

Section 18-623, despite its awkward construction, does not fall afoul of the vagueness line. Certain conduct is either clearly proscribed by the statute, such as providing transportation and shelter to minors seeking abortions in other states; clearly not proscribed by the statute, such as soliciting donations to organizations that support pregnant minors seeking abortions; or, in the case of conduct that might be understood as "recruiting," is subject to an "imprecise but comprehensible normative standard." *Valle Del Sol*, 732 F.3d at 1020.

The ordinary meaning of "recruiting," albeit broad, is sufficiently clear, such that we cannot say that Section 18-623 "specifie[s]" "no standard of conduct . . . at all." *Id.* Even in a novel context, different from conventional "trafficking," the ordinary meaning of "recruiting" is plain. In determining vagueness, we look to the words of the statute, not the moniker that the state legislature gives the statute.

We see no inconsistency in treating "recruiting" as a comprehensible standard, even if that standard impermissibly sweeps in a broad swath of protected speech, as discussed below. A statute that is not constitutionally vague may still be overbroad under the First Amendment.

## B. First Amendment Challenge—Right of Association

We briefly address and reject Challengers' contention that Section 18-623 facially burdens rights to expressive association. We conclude that Section 18-623 does not

restrict typical rights of association protected by the First Amendment.

Section 18-623 does not limit Challengers' ability to solicit donations, require them to unmask their anonymous members, impinge on the anonymity of their donors, or inhibit their general advocacy of the right to abortion in Idaho or elsewhere. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622–23 (1984). Idaho is not forcing anyone to refrain from supporting or joining these organizations. *See, e.g.*, *De Jonge v. Oregon*, 299 U.S. 353, 364–65 (1937). It is not requiring individuals or the organizations to join a group they otherwise would eschew. *See, e.g.*, *Janus v. Am. Fed. of State, Cnty., Mun. Emps.*, 585 U.S. 878, 892 (2018). It does not limit their ability to provide information, support, guidance, and options counseling to pregnant *adults* in Idaho. Challengers' associational arguments do not provide an additional basis to enjoin Section 18-623 on First Amendment grounds. On this point, we part ways with the district court's injunction to the extent it is based on associational rights.

## C. First Amendment Challenge—Speech

Challengers make a facial challenge to Section 18-623 on the ground that it infringes on their First Amendment speech rights. Normally, a successful facial challenge requires a showing "that no set of circumstances exists under which the [law] would be valid." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (alteration in original) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In the First Amendment context, however, "'to provide[] breathing room for free expression,' [the Court] ha[s] substituted a less demanding though still rigorous standard." *Id.* (quoting *Hansen*, 599 U.S. at 769). We therefore ask whether "a

substantial number of [the law's] applications are
unconstitutional, judged in relation to the statute's plainly
legitimate sweep." *Id.* (alteration in original) (quoting *Am.
for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021);
*see also Hansen*, 599 U.S. at 770 (asking whether the law
"prohibits a substantial amount of protected speech relative
to its plainly legitimate sweep" (internal marks and citation
omitted)). "There must, in other words, be 'a realistic danger
that the statute itself will significantly compromise
recognized First Amendment protections of parties not
before the Court.'" *Marquez-Reyes v. Garland*, 36 F.4th
1195, 1201 (9th Cir. 2022) (quoting *Acosta v. City of Costa
Mesa*, 718 F.3d 800, 811 (9th Cir. 2013)).

The first step is to assess the statute's scope, because "it
is impossible to determine whether a statute reaches too far
without first knowing what the statute covers." *Williams*,
553 U.S. at 293; *see also Moody*, 144 S. Ct. at 2398 ("The
first step in the proper facial analysis is to assess the state
laws' scope."). Section 18-623 criminalizes "abortion
trafficking," defined as "procur[ing] an abortion . . . by
recruiting, harboring, or transporting [a] pregnant minor
within" Idaho. In a disjunctive list like this one, each word
creates an independent alternative and thus "or" is implied
between each word. "Canons of construction ordinarily
suggest that terms connected by a disjunctive be given
separate meanings, unless the context dictates otherwise;
here it does not." *Reiter v. Sonotone Corp.*, 442 U.S. 330,
339 (1979); *see also Azure v. Morton*, 514 F.2d 897, 900 (9th
Cir. 1975) (explaining that "the use of a disjunctive in a
statute indicates alternatives and requires that they be treated
separately"). In accordance with these principles, we
construe the statute to cover abortion procurement for a

minor in Idaho that involves recruiting *or* harboring *or* transporting, and we treat these alternatives separately.

The statute's coverage therefore depends upon the meaning of each of these words—recruiting, harboring, transporting—in the context of an adult procuring an abortion for a minor without parental consent. We follow the approach of the Supreme Court and this circuit to assess the scope and potential overbreadth of each term individually. *See Am. for Prosperity Found.*, 594 U.S. at 615 (describing a specific "requirement" as "overbroad"); *Hansen*, 599 U.S. at 781–84 (referencing the overbreadth of a clause within a statute); *United States v. Rundo*, 990 F.3d 709, 716–21 (9th Cir. 2021) (upholding regulation as to "instigating" and "aid or abet," but not "urging," "organize," or "encourage," or "promote"); *Arce v. Douglas*, 793 F.3d 968, 985 (9th Cir. 2015) ("consider[ing] each [subsection] in turn" and defining overbreadth for each individually).

### 1. "Harboring" and "Transporting"

There is no serious confusion regarding what conduct constitutes "harboring" or "transporting" within the meaning of Section 18-623. Dictionaries define "harbor" as giving "shelter" or "refuge" to someone, including those who might be evading law enforcement or who need protection. [15]

---

[15] *See Harbor*, Oxford English Dictionary, https://www.oed.com/dictionary/harbour_v?tab=meaning_and_use (defining the verb "harbor" as "[t]o give shelter to; to shelter", and noting that current uses are "now mostly dyslogistic, as to conceal or give covert to noxious animals or vermin; to give secret or clandestine entertainment to noxious persons or offenders against the laws"); *Harbor*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harbor (defining verb as "to give shelter or refuge to"); *Harbor*, Cambridge

Meanwhile, "transport" denotes carrying or conveyance of something or someone from one place to another.[16] Given these definitions, and the context of these terms within the statute ("procuring . . . by harboring or transporting"), the conduct covered by "harboring" and "transporting" is not expressive on its face. Even crediting that there may be some expression associated with or implied in harboring or transporting, we are not convinced that the bulk of "harboring" or "transporting" acts covered by the statute are expressive.[17]

## 2. "Recruiting"

Because neither the "harboring" nor the "transporting" provision supports a facial First Amendment challenge to Section 18-623, this appeal turns on the meaning of the word "recruiting" within Section 18-623. Where a statute does not

---

Dictionary,

https://dictionary.cambridge.org/us/dictionary/english/harbor (defining verb as "to protect someone or something bad, especially by hiding that person or thing when the police are looking for him, her, or it"; "to protect someone by providing a place to hide").

[16] *Transport*, Oxford English Dictionary, https://www.oed.com/dictionary/transport_v?tab=meaning_and_use (defining the verb "transport" as "[t]o carry, convey, or remove from one place or person to another"); *Transport*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/transport ("to transfer or convey from one place to another"); *Transport*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/transport (defining verb as "to take goods or people from one place to another").

[17] We offer no opinion on whether Challengers could succeed on an as-applied challenge to these provisions. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006) ("Whether food distribution can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge . . . .").

define a term—and Section 18-623 does not define "recruiting"—we apply the term's ordinary meaning. *See Marquez-Reyes*, 36 F.4th at 1201–02. Following standard rules of statutory construction, "absent contextual evidence that [the Idaho legislature] intended to depart from the ordinary meaning of an undefined term, . . . the ordinary meaning of language 'expresses the legislative purpose.'" *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1161 (9th Cir. 2023) (citation omitted) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 57 (1990)).

Idaho does not define "recruiting" in this statute or in its other trafficking statutes, such that we might glean a legislative intent to depart from the plain meaning.[18] Other relevant sources also do not provide a specialized meaning. Neither the federal Trafficking Victims Protection Act nor the United Nations' Trafficking in Persons Protocol defines "recruitment." [19] The Second Circuit discussed "recruitment" in the context of trafficking but did not define it, suggesting that "recruiting," even in the context of trafficking, retains its plain meaning.[20] Other courts have

---

[18] *See* Idaho Code § 18-8602 (definitions as used in Chapter 86: Human Trafficking, mentioning but not defining "recruit"); Idaho Code § 18-5601 (definitions as used in Chapter 56: Commercial Sexual Activity, not mentioning "recruit").

[19] *See* 22 U.S.C. § 7102; Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children—Annex II to the United Nations Convention Against Transnational Organized Crime, G.A. Res. 55/25, U.N. Doc. A/RES/55/25 (Jan. 8, 2001). Though the TVPA contains a "definitions" section, and the Protocol has a "Use of terms" section, neither source defines "recruitment."

[20] *See United States v. Raniere*, 55 F.4th 354 (2d Cir. 2022).

done the same or used dictionary definitions.[21] Our review leads to the conclusion that there is no specialized meaning of "recruit" to which we could give a "fair shake." *Hansen*, 599 U.S. at 774–75.

Like the Supreme Court, then, we look to dictionary definitions. The ordinary meaning of the verb "recruit" is to seek to persuade, enlist, or induce someone to join an undertaking or organization, to participate in an endeavor, or to engage in a particular activity or event.[22] Given this plain meaning, we analyze the scope of "recruiting" in the context of Section 18-623. Because this is a facial challenge, we consider the intended activities not only of the parties, but also of non-parties whose intended course of conduct may

---

[21] *See United States v. Sims*, 11 F.4th 315 (5th Cir. 2021); *United States v. Jungers*, 702 F.3d 1066 (8th Cir. 2013) (same); *see also Commonwealth v. Dabney*, 478 Mass. 839, 856 (2018) (applying the ordinary meaning of recruit to Massachusetts's human trafficking statute by looking to dictionary definition).

[22] *See Recruit*, Oxford English Dictionary, https://www.oed.com/dictionary/recruit_v?tab=meaning_and_use (defining the verb "recruit" as "[t]o seek or enlist new recruits to a military force;" "to seek or enlist new members, supporters, or employees;" "[t]o acquire (a person) as an employee, member, or supporter of a society, organization, etc.;" and "[t]o induce or enlist (a person) to participate or provide assistance"); *Recruit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/recruit (defining verb as "to enlist as a member of an armed service;" "to seek to enroll;" and "to enlist new members"); *Recruit*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/recruit (defining verb as "to persuade someone to work for a company or become a new member of an organization, especially the army;" "to persuade someone to become a new member of an organization;" "to employ new people to work for a company or organization;" "to find new people to take part in an activity or event, or to help you in some way").

be compromised by the statute. *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society— to prevent the statute from chilling the First Amendment rights of other parties not before the court.").

Idaho endeavors to limit the statute's scope by asserting simply that "providing information to minors" is not proscribed by Section 18-623. However, information— especially information trying to persuade a girl to have an abortion or regarding the provider, time, place, or cost of an available abortion—could satisfy the plain meaning of "recruit." And provision of that information to a minor in conjunction with procuring an abortion could well be a violation of Section 18-623 and subject an individual to criminal liability.

The statute contains the following limiting language: "the terms 'procure' and 'obtain' shall not include the providing of information regarding a health benefit plan." Idaho Code § 18-623(1). This narrow exclusion leaves wide open the fate of information *not* circumscribed by a "health benefit plan." For instance, Challenger Matsumoto would like to continue "provid[ing] advice on how pregnant people, including minors, can legally access [a]bortions," "provid[ing] information and options counseling to . . . pregnant minors, about abortion," and giving advice and support to organizations that assist pregnant minors who are survivors of domestic violence and sexual assault. The Indigenous Idaho Alliance would like to continue providing "pregnant people, including minors, with reproductive health care information, including information about abortion." The Northwest Abortion Access Fund would like to continue providing "emotional . . . and informational

assistance" to pregnant minors. Any of these activities could arguably satisfy the plain meaning of "recruiting" and, coupled with "procuring" or "obtaining" an abortion, put individuals and organizations at risk of criminal penalties.

Apart from providing information, "recruiting" may also include subsidizing or fully funding an abortion—whether through donations or discounted services—by making the abortion more attractive (persuading) or more feasible (inducing). The Indigenous Alliance asserts that it may "provide financial assistance" for the "coordinat[ion of] the travel of pregnant people, including minors, from locations across the region, including Idaho, to and across state lines to access abortion." The Northwest Fund, too, wishes to continue providing "financial, logistical [and] practical assistance." Its work has involved "booking and paying for bus tickets, plane tickets, and ride shares"; "providing volunteers to drive patients to abortion appointments in states where abortion is legal"; and "provid[ing] food assistance, funding to abortion providers for their work, and lodging assistance." Similar activities might include offering a discount on medical procedures for under-resourced people, including minors, or setting up doctors' appointments for abortions and broadcasting the availability of those appointments to minors.

Like the parties, *Amici* express concerns that "recruiting" will encompass financial support and logistical assistance. They contemplate what Section 18-623 means to an individual who "financially supported . . . women who need help travelling out-of-state to obtain an abortion," as well as to advocates who assert a desire to continuing working "with people, including young people, to overcome the financial and logistical obstacles that prevent people from getting the abortions they need and want."

Legal advice, too, might constitute recruiting under Section 18-623, even if that advice persuades a minor to obtain a legal abortion. One organization, If/When/How: Lawyering for Reproductive Justice, "provides direct legal services . . . to ensure that young people have the legal rights and resources they need to make important decisions about their reproductive wellbeing. Through its national helpline, the organization provides legal information, advice, representation, and lawyer referrals to young people seeking access to abortion care."

Even expressions of persuasive encouragement might be prosecuted under the statute. Imagine an Idaho resident who lives near the border of Oregon and displays a bumper sticker that reads: "Legal abortions are okay, and they're right next door. Ask me about it!" A minor sees the sticker and, feeling desperate, approaches the driver to request a ride across state lines. "I need an abortion," the minor says, "and my parents can't know." The driver says: "I'm sorry, I can't drive you there. But, here, take this cash. That should cover the procedure." The minor takes the cash, finds a ride to Oregon with another minor, and gets a legal abortion with the money the driver provided. Under Section 18-623, the driver might be prosecuted for "recruiting." The driver's expression invited contact, causing the minor to approach and find out how to get a legal abortion. The bumper sticker, and perhaps the offer of cash, arguably persuaded or even induced the minor to have the abortion. The cash also paid for, or "procured," the abortion. Thus, the driver procured an abortion for the minor, in part by recruiting. Under Section 18-623, the adult need only have "the intent to conceal *an abortion*" from the parents. No similar intent to conceal applies to "recruitment"; the bumper sticker, or a sign, or a

pamphlet, can be out in the open for all to see and yet serve
as a hook for prosecution.

Worryingly, the "recruiting" provision encompasses an
adult's encouragement of a minor not only to obtain a legal
abortion out-of-state, but also to obtain a legal abortion in
Idaho under one of the few exceptions to the state's near-
total abortion ban, such as pregnancy resulting from an act
of rape or incest that was previously reported to law
enforcement. That is, an adult concerned for the wellbeing
of an underage victim of incest would be prohibited from
counseling and then assisting that victim in obtaining an
abortion without informing a parent—who may well be the
perpetrator.

Some "recruiting" appears at first glance to be out of
scope—namely, any "recruiting" that is not done in
conjunction with procuring an abortion or obtaining an
abortion-inducing drug for a minor. The statute does not
criminalize "recruiting" alone, but rather "procuring" or
"obtaining" by "recruiting." An adult merely distributing a
pamphlet of information on states' laws regarding abortion,
or displaying a pro-choice bumper sticker, would not fall
within the scope of the statute. Both examples may be an
effort to persuade a minor to consider an abortion, but in
neither case did the adult procure an abortion for a minor.
Even if the pamphleteer were stationed at the entrance of a
high school, and a pregnant minor, upon seeing the
information contained in the pamphlet, independently drove
across the border to obtain an abortion, the pamphleteer
would not have procured that abortion.

However, we note that these scenarios could be
considered an "attempt" to procure an abortion for a minor
by recruiting that minor without parental consent. If done in

tandem with another adult who did procure an abortion, the above could be form of "aiding and abetting" such procurement. With prosecutions for attempting or aiding and abetting procurement on the table, the reach of the statute could extend even further. For example, an attorney advising a minor about the minor's rights to obtain a legal abortion outside of Idaho and promising absolute confidentiality (including from the minor's parents), coupled with arrangements to procure an abortion, could be prosecuted for attempting or aiding and abetting a violation of Section 18-623. The same could be said of an employee of an advocacy organization counseling a minor about her healthcare options, providing the minor with the contact information of a partner organization in a neighboring state that can provide logistical or financial assistance in procuring or obtaining an abortion, and promising to keep the conversation a secret from the minor's parents.

These plain language applications of "procur[ing] . . . by recruiting" underscore that the statutory language covers a wide array of speech and conduct. Idaho's efforts to limit the reach of Section 18-623 are not consistent with the plain meaning of the statute. Ultimately, "[w]e may not uphold the statutes merely because the state promises to treat them as properly limited." *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010).

Having ascertained the broad scope of "recruiting," we next ask whether the speech or conduct swept into that scope is expressive and protected under the First Amendment. Speech is protected unless it falls within a narrow exception to First Amendment protection. *See, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468 (2010) (listing categories: "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct" (internal citations omitted)).

Conduct, too, may be protected, if it evinces "an intent to convey a particularized message" and "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410–11 (1974).

Encouragement, counseling, and emotional support are plainly protected speech under Supreme Court precedent, including when offered in the difficult context of deciding whether to have an abortion. In *McCullen v. Coakley*, the Court held that "sidewalk counseling"—the act of having a "close, personal conversation" with a person entering an abortion clinic as an "effective means of dissuading women from having abortions" was, without question, protected speech. 573 U.S. 464, 473, 487 (2014); *see also id.* at 489 ("Petitioners . . . seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them. Petitioners believe that they can accomplish this objective only through personal, caring, consensual conversations."); *Hill v. Colorado*, 530 U.S. 703, 714 (2000) (stating that the "First Amendment interests" of the "sidewalk counselors" in that case were "clear and undisputed"); *cf. Nat'l Inst. of Fam. & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018) ("By requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech." (quoting *Riley v. Nat'l Fed. of Blind of N.C.*, 487 U.S. 781, 795 (1988))). If counseling those who are about to obtain abortions to instead carry their pregnancies to term is undoubtedly protected speech, then surely the opposite is

MATSUMOTO V. LABRADOR

true as well. [23] This protection includes promotion and urging of particular actions. *Rundo*, 990 F.3d at 717. Even if speech induces a particular course of action, the speech is protected as long as that action is not illegal. *Hansen*, 599 U.S. at 782–83. "I think you should get a legal abortion in Washington," or "we believe in and fund legal abortions"— these, too, are protected expressions.

Likewise, information related to the availability of abortions, education on reproductive health care options, and instruction as to how to access an abortion legally are also protected under Supreme Court precedent. Announcements related to the availability of abortions "involve the exercise of the freedom of communicating information and disseminating opinion." *Bigelow v. Virginia*, 421 U.S. 809, 822 (1975) (regarding an advertisement that stated: "Abortions are now legal in New York. There are no residency requirements"). A "purely factual" statement about a medical drug is also protected, so long as it is a statement of public interest. *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760–65 (1976). Information and instructions regarding the

---

[23] Consider, for example, the statements of a representative from a crisis pregnancy center during the Senate committee hearing on Section 18-623. *See* Senate Committee Debate at 14:00. In her testimony in support of the bill, she described a scenario not unlike one that Challengers might face: A pregnant minor comes to the center, scared, perhaps afraid to tell her parents, and looking for guidance, and the representative provides that guidance, but only in support of continued pregnancy. *Id*. Giving advice to a pregnant minor is legal and presumably protected expression in Idaho—even without informing the minor's parents and obtaining their consent—if that advice is directed toward advising that minor to carry her pregnancy to term. But under Section 18-623, advice arguably becomes illegal "recruitment" when it offers an abortion—critically, including a legal abortion in another state—as an option.

availability and means of procuring an abortion procedure or
drug (likely including specifics, such as who the provider is,
when and where the procedure would take place, or what a
drug would cost) are thus squarely protected.

One facet of recruiting encompasses legal advice about
the minor's rights. The First Amendment protects speech
"advocating lawful means of vindicating legal rights,"
including "advising another that his legal rights have been
infringed." *In re Primus*, 436 U.S. 412, 432 (1978)
(alterations omitted) (quoting *NAACP v. Button*, 371 U.S.
415, 437, 434 (1963)).

Public advocacy and education campaigns on issues of
public interest are also protected political speech. *See, e.g.*,
*Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S.
449, 470 (2007). This includes advocacy campaigns that
encourage minors to consider the full range of available
reproductive health care options.

Whatever the degree of their protection, none of these
expressions lose that protection when expressed to minors.
"[O]nly in relatively narrow and well-defined circumstances
may government bar public dissemination of protected
materials to [minors]." *Erznoznik v. City of Jacksonville*, 422
U.S. 205, 213 (1975). "Speech that is neither obscene as to
youths nor subject to some other legitimate proscription
cannot be suppressed solely to protect the young from ideas
or images that a legislative body thinks unsuitable for them."
*Id.* at 213–14. The statute's mens rea requirement—"with
the intent to conceal an abortion from the parents or guardian
of a pregnant, unemancipated minor"—also does not delimit
the First Amendment problems with Section 18-623. The
Supreme Court has expressed its "doubts" that "punishing
third parties for conveying protected speech to children *just*

*in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 802 (2011).

We now come to Idaho's contention that the expressive speech and conduct covered by "recruiting," otherwise protected by the First Amendment, is rendered unprotected because it is speech integral to criminal conduct. For that exception to apply, speech must be "used as an integral part of conduct in violation of a valid criminal statute." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949). It is true that "recruitment" under Section 18-623 occasionally may be "speech integral to criminal conduct," but those circumstances reflect a small subset of the protected speech covered within recruitment.

Idaho is correct that recruiting an Idaho minor to get an illegal abortion in Idaho qualifies as speech integral to criminal conduct. *See, e.g.*, Idaho Code § 18-622 (criminalizing nearly all abortions in Idaho). In recognition of the Supreme Court's decision in *Dobbs*, we assume without deciding that Section 18-622 is a valid criminal statute. *Dobbs*, 597 U.S. at 301. Thus, "recruiting" under Section 18-623, to the extent that it induces a minor to violate Section 18-622 via the adult's procurement of abortion for that minor, would be speech integral to criminal conduct.

But Section 18-623 goes well beyond the strictures of Section 18-622, and indeed beyond Idaho's borders. The statute explicitly reaches procurement of abortions that are legal where they are performed: "It shall not be an affirmative defense to a prosecution . . . that the abortion provider or the abortion-inducing drug provider is located in another state." Idaho Code § 18-623(3).

Idaho's asserted police powers do not properly extend to abortions legally performed outside of Idaho. As Justice Blackmun wrote:

> A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State. It may seek to disseminate information so as to enable its citizens to make better informed decisions when they leave. But it may not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State.

*Bigelow*, 421 U.S. at 824–25.

To qualify as speech "integral to unlawful conduct," the speech must be done in furtherance of the commission of an underlying criminal offense. *Hansen*, 599 U.S. at 783 (interpreting 8 U.S.C. § 1324(a)(1)(A)(iv), which criminalizes "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law"); *see also Marquez-Reyes*, 36 F.4th at 1201–05 (interpreting 8 U.S.C. § 1182(a)(6)(E)(i), which makes inadmissible "any alien who . . . knowingly has encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the United States in violation of law"). A legal abortion— whether performed in Idaho, under an exception to Section 18-622, or in another state—is not a criminal offense and so

cannot serve as the "underlying offense" to render otherwise
protected speech unprotected.

Can the abortion trafficking statute manufacture both the
"underlying offense" and the exception to otherwise
protected speech? Idaho cites *United States v. Dhingra* as
support for the proposition that it can. In *Dhingra*, we
interpreted a statute as regulating only unprotected speech
when it regulated "the targeted inducement of minors for
illegal sexual activity"—even if speech was used as the
"vehicle" for "ensnar[ing] the victim." 371 F.3d 557, 561
(9th Cir. 2004), *as amended on denial of reh'g* (July 23,
2004) (quoting *United States v. Meek*, 366 F.3d 705, 721 (9th
Cir. 2004)). Both that opinion and the statute in question
referenced separate, non-expressive activity that was illegal,
independent of the inducement thereof. *See* 18 U.S.C.
§ 2422(b) (criminalizing inducement of others' engagement
"in prostitution or any sexual activity for which any person
can be charged with a criminal offense"). The Supreme
Court addressed a similar point in *United States v. Williams*:
speech may be criminalized where it is "intended to induce
or commence illegal activities"—that is, *independent*
activities that are illegal. 553 U.S. at 298.

Under this statute, a prosecution may be brought against
someone who procured an abortion for a minor by recruiting,
but not harboring or transporting, that minor. In the context
of a legal abortion, recruiting may be the only hook for
potential prosecution under Idaho Code Section 18-623. In a
case where the adult procures a legal abortion by recruiting
the minor, but not by harboring or transporting the minor,
there is no underlying offense but the recruitment itself. To
the extent that such recruitment is protected speech, it cannot
serve to self-invalidate. Labeling protected speech as

criminal speech cannot, by itself, make that speech integral to criminal conduct.

Next, we evaluate whether the broad scope of Section 18-623's ban on "recruiting" "unduly burden[s] expression." *Moody*, 144 S. Ct. at 2398 (quoting *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)). In this final step, we must determine whether the statute's prohibition on "procuring an abortion" by "recruiting" a minor, given its ordinary meaning, is unconstitutional in "a substantial number of its applications . . . judged in relation to [its] plainly legitimate sweep." *Am. for Prosperity Found.*, 594 U.S. at 618. We conclude that it is.

As discussed above, "recruiting" has broad contours that overlap extensively with the First Amendment. It sweeps in a large swath of expressive activities—from encouragement, counseling, and emotional support; to education about available medical services and reproductive health care; to public advocacy promoting abortion care and abortion access. It is not difficult to conclude from these examples that the statute encompasses, and may realistically be applied to, a substantial amount of protected speech. Whether that protected speech is assessed against all activities covered by the individual "recruiting" component, *cf. Hansen*, 599 U.S. at 781–84; *Rundo*, 990 F.3d at 716–21, or benchmarked against the statute as a whole, *cf. New York v. Ferber*, 458 U.S. 747, 773–74 (1982), it is substantial in proportion. We therefore hold that the statute is unconstitutionally overbroad.

## IV. Severability

We now come to the question of whether the "recruiting" prong of Section 18-623—where we have held the

constitutional infirmity with the statute lies—is severable from the rest of the statute. We conclude that it is.

Because severability is an issue of state law, we "must follow the approach the Idaho Supreme Court would take to the severability question." *Wasden*, 376 F.3d at 935. Under Idaho law,

> Whether portions of a statute which are constitutional shall be upheld while other portions are eliminated as unconstitutional involves primarily the ascertainment of the intention of the legislature. When part of a statute or ordinance is unconstitutional and yet is not an integral or indispensable part of the measure, the invalid portion may be stricken without affecting the remainder of the statute or ordinance. However, if an unconstitutional portion of a statute is integral or indispensable to the operation of the statute as the legislature intended, the provision is not severable, and the entire measure must fail.

*Id.* (quoting *State v. Nielsen*, 960 P.2d 177, 180 (Idaho 1998)). Idaho courts apply this standard to severability questions regardless of whether the statute in question contains a severability clause, as this one does. *See* Idaho Code § 18-616; *Boundary Backpackers v. Boundary County*, 913 P.2d 1141, 1148 (Idaho 1996) (holding that unconstitutional provisions were not severable despite a severability clause because the provisions were "integral or indispensable to the ordinance").

In our view, the "recruiting" prong of Section 18-623 is neither integral nor indispensable to the operation of the statute as the Idaho legislature intended and therefore may be severed from the rest of the law. Without the "recruiting" prong, the statute criminalizes "harboring or transporting" a minor to "procure an abortion" "with the intent to conceal [the abortion] from the parents or guardian" of the minor—an intelligible crime that reaches the problems the legislature sought to rectify.[24] *Compare, e.g.*, *Wasden v. State Bd. of Land Comm'rs*, 280 P.3d 693, 701 (Idaho 2012) (holding that the unconstitutional provisions of a statute were not severable because "every aspect of the statute that relates to something other than [the unconstitutional provision] is either moot or superfluous"), *with Boundary Backpackers*, 913 P.2d at 1148 (declining to sever because to do so would "emasculate[] the obvious purpose of the ordinance"). Idaho asserts that "sheltering (or harboring) a minor without permission from the minor's parents and transporting that minor within the state, again without parental permission" constitutes the "core conduct" meant to be covered by the statute. Idaho does not similarly characterize "recruiting" as "core" to the statute. And while Idaho has already enacted child protection laws that reach the type of conduct covered by "harboring" and "transporting," those laws do not graft perfectly onto either the definition of "abortion trafficking" in Section 18-623 or the punishment accorded to those

---

[24] *See* House Committee Debate at 59:15 (expressing concerns about three trafficking scenarios, all of which require the harboring and transporting of the minor and not mere recruiting).

convicted. **[25]** Therefore, we cannot say that, without the "recruiting" prong, Section 18-623 would be entirely subsumed into existing child protection statutes, such that "recruiting" is rendered integral and indispensable to Section 18-623.

## V. The Remaining *Winter* Factors

Although success on the merits is the most important *Winter* factor, we address the other injunction factors, which require little analysis. Irreparable harm is a given: "Because [Challengers] have a colorable First Amendment claim, they have demonstrated that they likely will suffer irreparable harm." *Am. Bev. Ass'n v. City of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc). And for the same reasons, the balance of equities and public interest favors Challengers, because if a party "has (at a minimum) raised serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023) (internal marks and citation omitted). Finally, we note that the third and fourth factors "merge" because the injunction is against a government entity. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (combining these factors "when the Government

---

[25] *Compare* Idaho Code § 18-623 (abortion trafficking, punishable by no less than two years' and no more than five years' incarceration), *with id.* § 18-4506 (child custody interference, punishable as a felony by no more than five years' incarceration or a fine not exceeding $50,000), *id.* § 18-1509 (enticing of children, punishable on a first offense by no more than six months' incarceration or a fine not exceeding $1,000), *id.* § 18-1510 (providing shelter to runaway children, punishable by no more than six months' incarceration and/or a fine not exceeding $5,000); *and id.* § 18-4501–04 (kidnaping in the second degree, punishable by no less than one year's incarceration and no more than twenty-five years' incarceration).

is the opposing party"). We do not question Idaho's interest in protecting the children within its borders. But Idaho may protect those interests without infringing upon Challengers' constitutional rights. *Meinecke*, 99 F.4th at 526.

## Conclusion

Section 18-623, a novel post-*Dobbs* legislative undertaking, will continue to be subject to careful testing in further litigation in the district court and beyond. Our holding at this early preliminary injunction stage is narrow: Challengers are likely to succeed in their claim that Section 18-623's "recruiting" prong is an unconstitutional infringement on their protected speech. We therefore affirm the district court's order preliminarily enjoining the Idaho attorney general from enforcing the "recruiting" prong of Section 18-623. Because Challengers are not likely to succeed on the merits of their remaining claims—the void-for-vagueness and association claims, as well as the other First Amendment claims with respect to the remainder of the statute—we reverse the district court with respect to those claims and remand to the district court to modify the preliminary injunction consistent with this opinion.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

52          MATSUMOTO V. LABRADOR

BEA, Circuit Judge, concurring in the judgment in part and dissenting in part:

Plaintiffs in this case have sued the Idaho Attorney General ("AG") and obtained a preliminary injunction precluding him—but no one else, as he is the sole party Defendant—from enforcing an Idaho statute that the Plaintiffs allege, and the majority concludes, is at least partially unconstitutional. Just one problem: on this record, the AG does not and cannot enforce the statute in question— only 44 county prosecutors can. The AG can enforce the statute only if one or more of the county prosecutors refuses to do so. None has. Thus, Plaintiffs have sued the wrong person, and, even having prevailed in district court, Plaintiffs remain subject to the same allegedly unlawful prosecutions from which they sought relief in every one of the 44 counties of Idaho. In other words, Plaintiffs' injuries are not traceable to the AG, and, for the same reasons, the injunction issued by the district court does not redress their alleged injuries.

Accordingly, Plaintiffs have not established Article III standing, and the federal courts lack jurisdiction to consider their claims. Because the majority concludes otherwise, I respectfully dissent.[1]

**I.**

The general scheme of criminal enforcement in Idaho contemplates a limited role for the AG. Under Idaho law, "[i]rrespective of police powers vested by statute in state . . . officers, . . . the primary duty of enforcing all the penal provisions of any and all statutes of this state, in any

---

[1] To the extent the majority reverses in part the district court's grant of a preliminary injunction, I concur only in the judgment.

court, is vested in the . . . prosecuting attorney of each of the several counties." Idaho Code § 31-2227. Idaho's county prosecutors are vested with "the duty . . . to prosecute . . . all actions, civil or criminal, in the district court of his county" and "[t]o prosecute all felony criminal actions." *Id.* § 31-2604(1)–(2). For his part, the AG is responsible for "assist[ing] the prosecuting attorney [of any county] in the discharge of duties." *Id.* § 67-1401. Therefore, under Idaho's criminal enforcement scheme, the county prosecutors retain discretion and control over their prosecutions, and, generally, the AG may not usurp that role for himself "to the exclusion of" the county prosecutors. *Newman v. Lance*, 922 P.2d 395, 399 (Idaho 1996).

This is not to say that the AG can never step in when a county prosecutor fails to enforce faithfully the law as written. Idaho law provides that he can do so, when, "in the judgment of the governor the penal laws of this state are not being enforced as written[] in any county." Idaho Code § 31-2227(3). "In such an instance, the attorney general shall exclusively exercise all duties, rights and responsibilities of the prosecuting attorney." *Id.* So, the general backdrop of criminal enforcement in Idaho is as follows: the prosecuting attorneys in each county have primary responsibility for enforcement, for which they retain a good deal of broad discretion, and the AG has responsibility to assist them as necessary. But in the extraordinary event that the governor determines a prosecuting attorney has abandoned his duty, the governor can take action that allows the AG to assume the role for himself. No such action has occurred here. No Idaho statute gives the AG any independent authority to supervise or otherwise direct the county prosecutors.

Against that backdrop, the statute before us today adds a
bit of detail about how it is to be enforced. It provides that
the AG may, at his sole discretion, prosecute violations of
the statute, "*if* the prosecuting attorney . . . refuses to
prosecute any violations of any of the provisions of this
section by any person *without regard to the facts or
circumstances*." Idaho Code § 18-623(4) (emphasis added).
Two important conclusions follow from a plain reading of
that statutory text. First, the AG's discretion to bring a
prosecution under section 18-623 obtains only when the
relevant county prosecutor refuses to bring a case himself.
In other words, the AG may not step in to charge a violation
unless and until the prosecutor refuses to do so. Second, the
AG's authority to bring such a case is valid only if the county
prosecutor has so refused "without regard to the facts or
circumstances" of the particular case. This latter qualifier
preserves the general rule in Idaho (and, indeed, elsewhere)
that a "prosecutor is vested with a wide range of discretion
in deciding when and what crimes to prosecute." *State v.
Vetsch*, 618 P.2d 773, 774 (Idaho 1980).

What follows from this legal landscape is an
enforcement mechanism for this statute that differs only
slightly from Idaho's general regime. Whereas the general
rule is that the AG ordinarily cannot assume control of
prosecutions from county prosecutors absent the Governor's
intervention, section 18-623 provides that the AG can step
in unilaterally to prosecute a violation, but only when the
two conditions described above are met. So, while
Plaintiffs' contention that section 18-623 "expand[ed] [the
AG's] enforcement role" is somewhat accurate, it is not the
case that the AG "can prosecute under the new statute
regardless whether the county prosecutor wishes there to be
a prosecution." A plain reading of the statutory text, read

together with Idaho's general scope of the prosecutorial function, compels the conclusion that the AG's enforcement authority is limited to those situations in which the county prosecutor has declined to bring a case "without regard to the facts or circumstances." That is, the AG's ability to intervene is contingent not upon a county prosecutor's mere refusal to bring a case within his discretion, but upon his refusal to bring a case *without* having exercised his discretion, i.e., "without regard to the facts or circumstances" of the case. § 18-623(4).

## II.

On these facts, Plaintiffs do not have standing, as Plaintiffs have neither pleaded nor proven that any—not to say all—of the country prosecutors will act in such a way to render the AG responsible for their future prosecution, i.e., to trigger his authority to prosecute. "The party invoking federal jurisdiction bears the burden of establishing" Article III standing, which includes the burden to establish both "traceability" and "redressability." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 61 (1992). These two requirements are closely related, and they go hand in hand in the case before us today. Traceability means that "there must be a causal connection between the injury and the conduct complained of," i.e., the injury must be the result of some action by the defendant, "not the result of the independent action of some third party not before the court." *Id.* at 560 (cleaned up). Redressability means that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. at 561 (cleaned up). Relief that "does not redress a cognizable Article III injury" is therefore "not an acceptable Article III remedy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

As an initial matter, I do not dispute that Plaintiffs have plausibly alleged, as an injury in fact, a "credible threat of future prosecution." What I do dispute is *from whom that threat arises*. For this reason, the majority's reliance on a case about the injury requirement—and one that has nothing to do with traceability or redressability—is as inapposite as it is bizarre. Maj. Op. at 15–16, citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). The Court in *Susan B. Anthony List* concluded that the threat of future enforcement against the plaintiff was credible precisely "because the universe of potential complainants is *not restricted to state officials who are constrained by explicit guidelines or ethical obligations*."**[2]** 573 U.S. at 164 (emphasis added). Here, literally the opposite is true: the universe of potential complainants includes *only* state prosecutors constrained by ethical guidelines, and the AG, who by the terms of the statute possesses no enforcement authority unless and until a county prosecutor refuses to prosecute without consideration to the facts and circumstances. Such a refusal by any county prosecutor(s) has not occurred nor do

---

[2] The plaintiffs in *Susan B. Anthony List* were advocacy organizations that challenged an Ohio statute that criminalized false statements during political campaigns. 560 U.S. at 152–53. The statute authorized "any person acting on personal knowledge" to "file a complaint with the Ohio Elections Commission [] alleging a violation of the false statements statute." *Id.* at 153 (internal quotations omitted). The Supreme Court concluded that the plaintiffs had alleged an Article III injury in fact—credible threat of future enforcement—because there was "a history of past enforcement" against the plaintiffs, "authority to file a complaint [was] not limited to a prosecutor or an agency," and proceedings under the statute before the Commission were "not a rare occurrence." *Id.* at 164–65. So, besides being related to a different prong of the standing analysis, the case is factually quite distinct from this one: no Plaintiff (nor anyone else) has been prosecuted under section 18-623 to date, and only government prosecutors may enforce it.

MATSUMOTO V. LABRADOR                      57

Plaintiffs allege that it will occur in the future. In *Susan B. Anthony List*, the defendant Driehaus—and for that matter, any person in the whole world—could bring a complaint against the plaintiff. *See id.* Here, the sole defendant AG cannot prosecute the plaintiffs—not unless and until one or more of the 44 county prosecutors refuses to prosecute and does so without exercising his or her discretion. None of the county prosecutors are alleged or proven to have done so. For that reason, Plaintiffs cannot satisfy the other two critical standing elements, and *Susan B. Anthony List* simply does not say anything to alter that conclusion.

To see why Plaintiffs cannot satisfy traceability or redressability here, consider the injury at issue and how that injury will ostensibly occur. The alleged injury, according to the majority, is "a credible threat of prosecution under Section 18-623." Maj. Op. at 14. On the majority's telling, that injury is traceable to the AG as part of a "chain of enforcement [that] has, at most, three links." *Id.* at 18. The first link is that Plaintiffs engage in protected conduct "arguably proscribed by the statute." *Id.* That's easy enough to understand.  But the second link, according to my colleagues, is that "an Idaho county prosecutor refuses to prosecute the violation." *Id.* This is *the* critical step in the causation chain, because then, and only then, does the majority's third link come to pass, which is the AG's independent decision to bring a case himself. *Id.*

And it is at this second step where Plaintiffs' and the majority's theory of traceability and redressability falls apart. The majority's purported causation chain depends on the occurrence of a crucial event: an Idaho county prosecutor will refuse to prosecute a particular case, without regard to the facts and circumstances. That refusal *must occur* for the injunction at issue to be of any help to Plaintiffs. If it does

not occur, the AG has no authority to prosecute, and the injunction against him won't prevent the allegedly injurious prosecutions of Plaintiffs by county prosecutors. And whether that refusal will occur or not is an entirely speculative question—we simply do not know if or when a county prosecutor would refuse to bring a case. But "it is a bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (cleaned up). That idea flows from another bedrock principle, that "it must be *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (cleaned up) (emphasis added). And where, as here, Plaintiffs have requested "forward-looking relief, they must face a 'real and immediate threat of repeated injury'" to qualify for judicial relief. *Murthy*, 144 S. Ct at 1986 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). So, even under the majority's own construction of a causal chain, the Supreme Court's standing precedents clearly foreclose traceability and redressability here.

There is another flaw in the majority's second step, which is that it is not accurate. The second step is not, as the majority states, a county prosecutor's mere refusal to bring a case under section 18-623. The refusal must be "without regard to the facts or circumstances" of a particular case. § 18-623(4). Taking that requirement from the statute into account, not only does the majority's chain of causation require guessing *what* a county prosecutor will do in the future, but also *why* he will do it. But we have held before that "[t]here is no redressability, and thus no standing, where (as is the case here) any prospective benefits depend on an actor who retains broad and legitimate discretion the courts

cannot presume either to control or to predict." *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1016 (9th Cir. 2021) (quoting *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (cleaned up)). That is precisely the case here, where finding standing requires us to guess how 44 different Idaho county prosecutors may or may not exercise their discretion. Plaintiffs do not offer any allegations in their complaint, or testimonial evidence in their declarations, to support a likelihood that county prosecutors will refuse to prosecute, much less that they will do so without regard to facts or circumstances (they do not, for example, allege or adduce evidence that such a refusal has occurred anytime in the past). *See Murthy*, 144 S. Ct. at 1986 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) ("At the preliminary injunction stage, [plaintiffs] must make a 'clear showing' that [they are] 'likely' to establish each element of standing.").

My colleagues get around this causation issue first by asserting that an intervening action of a third party does not automatically break the causal chain. Maj. Op. at 17–18. Although I question whether this principle of our caselaw remains viable (if it ever was) after *Murthy*, *see* 144 S. Ct. at 1986 (recognizing the "bedrock principle" that courts cannot redress injuries caused by the independent actions of third parties not before the court), the more important issue here is not merely the independent actions of third parties but rather the entirely *uncertain* nature of those actions. We have no way of knowing how the county prosecutors would or would not exercise their discretion, so we are left to do nothing but speculate.

The majority responds that we do not need to speculate because the legislature "wrote this precise causation chain

into Section 18-623." Maj. Op. at 18. But a subjective belief by the legislature that someday, somewhere, an Idaho county prosecutor might decline to prosecute a violation of the statute, and do so without regard to the facts and circumstances of the case, cannot possibly carry Plaintiffs' burden to demonstrate standing. "At the preliminary injunction stage, [Plaintiffs] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986 (quoting *Winter*, 555 U.S. at 22). Here, that means Plaintiffs must demonstrate that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561. That the text of section 18-623 contemplates *the possibility* of an enforcement role for the AG in certain limited circumstances is beside the point. Plaintiffs must establish a concrete *likelihood* that the circumstances giving rise to the AG's enforcement authority have occurred or will occur in the future.

Given those clear instructions from the Supreme Court, it's no wonder that the cases from our sister Circuits on which the majority relies do not support its lawless position. In *National Press Photographers Ass'n v. McCraw*, 90 F.4th 770 (5th Cir. 2024), the Fifth Circuit found standing where the defendants were *required* to enforce the law (here, no such requirement). *Id.* at 784.**[3]** In *Bronson v. Swensen*, 500 F.3d 1099 (10th Cir. 2007), the Tenth Circuit found that there was *not* standing because the defendant lacked "primary authority for prosecution of criminal actions," which lay instead with local prosecutors. *Id.* at 1110

---

[3] By the way, the plaintiffs in that case had sued a district attorney—another name for a county prosecutor—as Plaintiffs in this case should have done. *Id.*

(cleaned up). Sound familiar? Not one case cited by the majority finds standing where the defendant's enforcement authority is entirely conditional on the actions of someone else, who is not a party to the litigation and whose decision-making processes the federal courts routinely decline to evaluate.

And what about the fact that Plaintiffs, even with this injunction in place, remain subject to prosecution by the county prosecutors? How can Plaintiffs establish, as they must, that the injunction nonetheless actually remedies their injury? *See Lujan*, 504 U.S. at 561. The majority solves that problem by locating a principle of "partial amelioration of a harm." Maj. Op. at 21. One problem with that solution is that it depends on the same speculative reasoning described above. The harm to Plaintiffs—threat of unlawful prosecution that chills their speech—is "partially ameliorated" if, and only if, a county prosecutor refuses to prosecute without regard to the facts or circumstances of a particular case. If that doesn't happen, then the harm is not ameliorated at all because the injunction does not preclude county prosecutors from bringing the prosecutions from which Plaintiffs seek relief. So, to recap, the injunction bars prosecution by someone who cannot prosecute (the AG), but does not bar prosecution by someone who can prosecute (the county prosecutors). What relief from injury does this result provide?

Another problem is the principle of "partial amelioration" itself, which the majority derives from a footnote in *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Maj. Op. at 21. There, the Supreme Court stated that a plaintiff can demonstrate redressability if the remedy would redress "a discrete injury to himself, [but he] need not show that a favorable decision will relieve his *every* injury."

*Larson*, 456 U.S. at 243 n.15 (emphasis in original). But here, there is only one injury, namely the threat of prosecution under section 18-623 for allegedly protected conduct. Plaintiffs cannot establish that the injunction here remedies that injury, partially or most importantly, *at all*. That the injury could in theory be inflicted by the AG in a limited and speculative set of circumstances does not render the injunction directed at him a valid Article III remedy.

The majority's misunderstanding of this concept is perhaps illustrated best by its reassurance that there is nothing to see here, because "[t]he point of the case-and-controversy requirement is to ensure that adverse legal interests of the parties on both sides are at issue." Maj. Op. at 18–19. Wrong. The point of Article III's standing requirement is to ensure that federal courts don't conduct "general legal oversight" over every matter on which parties may disagree. *See TransUnion LLC v. Ramirez*, 594 U.S. 413 at 423–424 (2021). But that is precisely what the majority has done here. By the terms of the injunction the majority blesses today, Plaintiffs' speech should be no less chilled—and they should be no less injured—as on the day they filed this lawsuit, because every Idaho county prosecutor remains free to prosecute them for the conduct they seek to protect. Not to worry, says the majority—a published Ninth Circuit decision has told Idaho state courts that such prosecutions would be unlawful under the federal Constitution if an Idaho county prosecutor brings a case. If that is not an advisory opinion, I do not know what would be. *See TransUnion*, 594 U.S. at 424 ("[F]ederal courts do not issue advisory opinions.").

None of this is to say Plaintiffs should be left without recourse from the allegedly unconstitutional prosecutions they fear. But "those seeking to challenge the

constitutionality of state laws are not always able to pick and choose the timing and preferred forum for their arguments." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021). Individual plaintiffs could file suit against the prosecutors for the counties in which they live to obtain relief for themselves. And "many federal constitutional rights are as a practical matter asserted typically as defenses to state-law claims, not in federal pre-enforcement cases like this one." *Id.* at 49–50. Plaintiffs would of course remain free to raise those defenses in as-applied challenges to specific prosecutions. Instead, the majority crafts a broad remedy, that applies everywhere in Idaho, and it sanctions an injunction that precludes the AG from exercising power he does not have in the first place. But we may not "disregard the traditional limits on the jurisdiction of federal courts just to see a favored result win the day." *Id.* at 51.

## III.

The majority's holding today is contrary to fundamental standing principles. It recognizes federal jurisdiction over a Defendant who is not responsible for Plaintiffs' claimed injuries. And it allows "[r]elief that does not remedy the injury suffered" to "bootstrap [Plaintiffs] into federal court." *Steel Co.*, 522 U.S. at 107. Standing "is not simply technical," and the majority's decision today "amount[s] to an advisory opinion without the possibility of any judicial relief[,] . . . grant[ing] unelected judges a general authority to conduct oversight of the decisions of the elected branches of Government." *California v. Texas*, 593 U.S. 659, 673 (2021) (citations omitted). I would reverse the district court in full and remand with instructions to dismiss the case for lack of subject matter jurisdiction.